| | |
|---|---|
| ELIZABETH MILLER, as the<br>Co-Personal Representative of the<br>Estate of Penelope (Penny) Spiller,<br>Deceased, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>HARTFORD LIFE INSURANCE<br>COMPANY, a Connecticut Domestic<br>For-Profit Corporation, et al.,<br><br>Defendants. | CIVIL NO. 09-00381 JMS-RLP<br><br>CERTIFIED QUESTIONS TO THE<br>HAWAIʻI SUPREME COURT FROM<br>THE UNITED STATES DISTRICT<br>COURT FOR THE DISTRICT OF<br>HAWAII IN CIV. NO. 09-00381 JMS-RLP |

## CERTIFIED QUESTIONS TO THE HAWAIʻI SUPREME COURT FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF HAWAII IN CIV. NO. 09-00381 JMS-RLP

## I. INTRODUCTION

This is an insurance bad faith suit brought under diversity jurisdiction

by a policy-holder against her insurance company arising out of the termination

(and subsequent reinstatement) of her long-term care benefits. Three related

Motions are pending: (1) Defendants[1] Hartford Life Insurance Company's

---

[1] The action originally was asserted against three Defendants: Hartford Life Insurance Co., Hartford Financial Services Group, and MedAmerica Insurance Co. This second Motion was filed on behalf of all three Defendants. On November 15, 2010, the parties stipulated to the

(continued...)

("Hartford Life") and MedAmerica Insurance Company's ("MedAmerica") Motion for Summary Judgment [Doc. No. 84] ("the Bad Faith Motion"); (2) Plaintiffs'[2] Motion to Withdraw Answers to Request for Admissions [Doc. No. 124] ("Motion to Withdraw"); and (3) Defendant Hartford Life's Motion for Partial Summary Judgment [Doc. No. 81] ("the Punitive Damages Motion").

After considering the Motions and supplemental briefing, the court determines that the Motions raise important questions of Hawaii law for which there is no clear controlling Hawaii precedent for purposes of Hawaiʻi Rule of Appellate Procedure 13 ("Rule 13").[3] The answers to the questions are "determinative of the cause" as to the Motions such that certification of the questions is appropriate under Rule 13. Accordingly, this decision certifies

---

[1](...continued)
dismissal of Defendant Hartford Financial Services Group, Doc. No. 111, but the Motion remains pending as to the two remaining Defendants.

[2] Penelope Spiller was originally the Plaintiff in this action. She passed away on September 10, 2010. Doc. No. 108. On December 21, 2010, Elizabeth Miller and Martin Kahae were substituted as the "Co-Personal Representatives of the Estate of Penelope (Penny) Spiller, Deceased, and as Party-Plaintiffs for Penelope (Penny) Spiller." Doc. No. 129. Although technically there are now two Plaintiffs, in this decision the court will refer to Spiller as the Plaintiff.

[3] Rule 13(a) provides, in pertinent part:

When a federal district or appellate court certifies to the Hawaiʻi Supreme Court that there is involved in any proceeding before it a question concerning the law of Hawaiʻi that is determinative of the cause and that there is no clear controlling precedent in the Hawaiʻi judicial decisions, the Hawaiʻi Supreme Court may answer the certified question by written opinion.

questions to the Hawaiʻi Supreme Court.

Rule 13 calls for "a statement of prior proceedings in the case, a statement of facts showing the nature of the cause, the question of law to be answered, and the circumstances out of which the question arises." Haw. R. App. P. 13(b). The following addresses these Rule 13(b) requirements.

## II. BACKGROUND

### A. Factual Background

#### 1. Spiller's Long-Term Care Policy with Hartford Life, and Hartford Life's Transfer of Certain Functions and Liabilities to MedAmerica

In 2001, Penelope Spiller ("Spiller"), a former State of Hawaii employee, purchased a Hartford Life long-term care insurance policy, LTG-1007, (the "Policy") issued to the Hawaii Public Employees' Health Fund. Pls.' Opp'n to Bad Faith Mot. Ex. 3 [Doc. No. 112-4]. The Policy became effective on February 1, 2001, when she was fifty-seven years old. *Id.* at 3.

On October 1, 2001, Hartford Life and MedAmerica (collectively "Defendants") entered into an Indemnity and Assumption Reinsurance Agreement ("Reinsurance Agreement"), in which Hartford Life transferred certain policy liabilities and administrative functions for its long-term care policies to MedAmerica. Pls.' Opp'n to Punitive Damages Mot. Ex. 2, at 1 [Doc. No. 106-3]. MedAmerica, as "assumption reinsurer," accepted the policy liabilities of all

3

policies other than those of "non-consenting policyholders" on the "assumption effective date." *Id.* at 1-2, 6. The Reinsurance Agreement contemplated that certain policyholders would not agree to a novation and would thus be designated as "non-consenting policyholders" for which Hartford Life would still retain certain responsibilities. The Hawaii Public Employees' Health Fund did not consent, and so its policyholders as of that date -- such as Spiller -- became "non-consenting policyholders." *Id.* at 3; Bush Decl. ¶ 3, Oct. 7, 2010 [Doc. No. 82-1 ¶ 3].[4] As to those non-consenting policyholders, MedAmerica became the "indemnity reinsurer" and a co-insurer with Hartford Life. Pls.' Opp'n to Punitive Damages Mot. Ex. 2 §§ 2.1-2.4, 6.2 [Doc. No. 106-3]. That is, Hartford Life remains responsible for certain obligations to non-consenting policyholders.

The Reinsurance Agreement also transferred administrative functions from Hartford Life to MedAmerica. MedAmerica became the sole administrator

---

[4] "Non-Consenting Policyholder" means any Policyholder:

(i) who fails to give an affirmative consent in any jurisdiction in which affirmative consent or non-objection is required for assumption reinsurance to be effective; (ii) who objects to the assumption by Reinsurer as its direct obligation of the Policy Liabilities under a Policy under Article III hereof; or (iii) who resides in a jurisdiction in which a Governmental Authority having jurisdiction over an Assumption Certificate and/or this Agreement fails to approve the Assumption Certificate and/or this Agreement, if required by Applicable Law.

Pls.' Opp'n to Punitive Damages Mot. Ex. 2, at 3 [Doc. No. 106-3].

(*i.e.*, the administrator for both consenting and non-consenting policyholders), responsible for "administrative services."  Pls.' Opp'n to Punitive Damages Mot. Ex. 2, § 5.1(a) [Doc. No. 106-3].  Administrative services included receiving, processing, investigating, evaluating, and paying claims filed by policyholders.  *Id.* § 5.2.  MedAmerica was also allowed to use Hartford Life's names, logos, trade names, trademarks, and service marks for the purposes of performing the administrative services.  *Id.* § 14.2.  In effect, as to non-consenting policyholders, MedAmerica became Hartford Life's managing agent.

The parties dispute the scope of the transfer of obligations, and contest the precise meaning of certain terms of the Reinsurance Agreement.  In particular, Hartford Life disputes whether it can be liable for punitive damages based upon acts of MedAmerica.  Regardless, it appears undisputed that Hartford Life still has responsibility -- whether as a reinsurer, coinsurer, or as an indemnitor -- for fulfilling actual policy obligations (payment of benefits) owed to non-consenting policyholders such as Spiller.

### 2. *Spiller's Diagnosis with Lung and Brain Cancer and Her Claim for Policy Benefits*

On January 6, 2007, Spiller -- then a sixty-three year old resident of Molokai -- suffered a grand mal seizure and was diagnosed with lung cancer that had metastasized to her brain.  Pls.' Opp'n to Bad Faith Mot. Ex. 4 [Doc. No. 112-

5].  Spiller applied in May 2007 for long-term care benefits under the Policy.  *Id.*

Ex. 5 [Doc. No. 112-6].

Policyholders become eligible for benefits under the Policy if

"chronically ill."  Pls.' Opp'n to Bad Faith Mot. Ex. 3, at 15 [Doc. No. 112-4].

The term "chronically ill" means being certified by a "licensed health care

practitioner" within the year prior to seeking benefits as:

      a)      being unable to perform (without Hands-on
                  Assistance from another individual) at least two
                  Activities of Daily Living[5] for a period of at least

---

[5] The Policy defines "Activities of Daily Living" ("ADLs") as consisting of the following "self-care functions":

| | |
|---|---|
| Bathing: | Washing Yourself by sponge bath; or in either a tub or shower, including the task of getting into or out of the tub or shower. |
| Dressing: | Putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs. |
| Toileting: | Getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene. |
| Transferring: | Moving into or out of a bed, chair or wheelchair. |
| Continence: | The ability to maintain control of bowel and bladder function; or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag). |
| Eating: | Feeding Yourself by getting food into Your body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously. |

(continued...)

90 days due to a loss of functional capacity; or

b)   requiring Substantial Supervision[6] to protect Yourself from threats to health and safety due to a Severe Cognitive Impairment.[7]

*Id.* at 7.

To establish a "Severe Cognitive Impairment," the Policy requires a policyholder to: (1) incorrectly answer four or more questions on the "Short Portable Mental Status Questionnaire," (2) achieve a score of 23 or lower on the Folstein Mini-Mental Status Exam ("Folstein"), or (3) "[e]xhibit specific behavioral problems requiring daily supervision, including but not limited to: wandering, abusive or assaultive behavior, poor judgement (sic) or uncooperativeness which poses a danger to them or others, extreme bizarre personal hygiene habits." Pls.' Opp'n to Bad Faith Mot. Ex. 7 [Doc. No. 112-8].

MedAmerica found Spiller eligible for such benefits, and her

---

[5](...continued)
Pls.' Opp'n to Bad Faith Mot. Ex. 3, at 5 [Doc. No. 112-4].

[6] "Substantial Supervision" means "continual supervision (which may include cueing by verbal prompting, gestures or other demonstrations) by another person that is necessary to protect You from threats to Your health or safety (such as may result from wandering)." Pls.' Opp'n to Bad Faith Mot. Ex. 3, at 10 [Doc. No. 112-4].

[7] "Severe Cognitive Impairment" means "a loss or deterioration in intellectual capacity that requires Substantial Supervision and is comparable to (and includes) Alzheimer's disease and similar forms of irreversible dementia and is measured by clinical evidence and standardized tests that reliably measure impairment[.]" Pls.' Opp'n to Bad Faith Mot. Ex. 3, at 10 [Doc. No. 112-4].

caregiver (her companion Martin Kahae) was paid for services starting in October 2007.  (As previously noted, Kahae was appointed co-Personal Representative of Spiller's estate upon her death after this suit was filed.)

After providing coverage for nearly a year, MedAmerica terminated Spiller's benefits on August 25, 2008.  On January 23, 2009, however, it reinstated her benefits retroactively.  The circumstances and reasons for the five-month termination (and subsequent reinstatement) are disputed, and are the subject of this suit and the Bad Faith Motion as set forth below.

### 3.    *Circumstances of Spiller's Claim for Benefits*

After Spiller applied for benefits, she had a Benefit Determination Assessment ("BDA") performed by registered nurse Michael Kahalekulu ("Kahalekulu") in May 2007 to determine her eligibility, as the Policy requires.  *Id.* Ex. 3, at 32; Defs.' Bad Faith Mot. Ex. 8 [Doc. No. 86-1].  Kahalekulu determined that Spiller was unable to perform two ADLs and needed supervision because of seizures.  Defs.' Bad Faith Mot. Ex. 8 [Doc. No. 86-1].  Accordingly, by letter (on Hartford stationary) from claims handler Annette LaFica ("LaFica") dated October 17, 2007, benefits were approved and Hartford recommended Spiller have 24-hour supervision.  Pls.' Opp'n to Bad Faith Mot. Ex. 5 [Doc. No. 112-6].  (The time between application and approval included a 90-day elimination or "deductible"

8

period.)  *Id.* Ex. 3, at 3; Defs.' Bad Faith Mot. Ex. 4, LaFica Dep. at 21 [Doc. No.

85-6].

Defendants argue that Spiller was given only "conditional approval"

(subject to reassessment) in October 2007, and that in actuality the May 2007 BDA

failed to demonstrate that Spiller was impaired enough (either through ADLs or

cognitively) to meet eligibility requirements.  Defs.' Bad Faith Mot. at 3-5; Ex. 4,

LaFica Dep. at 34, 36 [Doc. No. 85-6].  They contend Spiller knew her benefits

were "conditional" when the benefits were approved.  *Id.* Ex. 10.[8]

---

[8] A lengthy "Call Notes Report" of October 18, 2007 by LaFica reads in part as follows:

> Spoke with daughter, Jessie[,] yesterday and advised her that we
> were able to approve [Spiller] for benefits with an incur date of
> 5/21/07. . . . We have ample documentation that [Spiller] is a very
> ill person.  [Diagnosis] is [cancer] of the lungs with [metastasis] to
> the brain.  The brain lesions are causing seizure activity.  The
> seizures leave [Spiller] [in]capacitated for days and at those times
> she is an almost total assist with all ADL's.  Based on the BDA she
> did not meet triggers.  I requested records from 2 of her treating
> physicians.  Dr. Dan, as he is called by the family, (they describe
> him as a "surfing doctor[]") keeps very sketchy records.  After 4
> attempts to secure his office notes I still don't have the official
> record.  [Spiller] lives on a remote Hawaiian island and doesn't
> seek tx after the seizures.  Tx after these seizures would be pretty
> much comfort measures and logistically . . . doesn't make any
> sense. . . . I suggested that we deny/appeal/re-assess.  Her EP
> [elimination period] is calendar day and she did not want to deny
> because the time toward EP would be lost.  Again requested
> records from Dr. Dan which did not shed any light on seizure
> frequency.  I have had increased contact with daughter over the
> past 2-3 weeks.  She reports on multiple occassions (sic) that
> [Spiller] is having seizures.  [Spiller] can't get out of bed, transfer,
> toilet, bath or dress with increasing frequency.  Dr. Dan did send a

(continued...)

On December 21, 2007, Kahalekulu performed another BDA for Spiller, indicating that she needed assistance with at least three ADLs (bathing, dressing, and transferring) and also that she had a Folstein score of 19 -- meaning she had a "Severe Cognitive Impairment." Pls.' Opp'n to Bad Faith Mot. Ex. 6 [Doc. No. 112-7]. Accordingly, Spiller's benefits were extended through June 30, 2008. *Id.*

Spiller had a third BDA (also performed by Kahalekulu) on July 28, 2008. *Id.* Ex. 8 [Doc. No. 112-9]. According to Spiller, this BDA shows that she required assistance with two ADLs (bathing and dressing) and that she required supervision because of her cognitive impairments, although her Folstein score had increased to 25. *Id.*

Benefits were then cancelled. On August 25, 2008, Barbara Mottern -- a new Hartford/MedAmerica contact (*i.e.*, not LaFica, who had been handling Spiller's claim) -- telephoned Spiller to tell her that her benefits were being terminated. Mottern told Spiller that she no longer considered her to be "cognitively impaired" or incapable of performing two ADLs. *Id.* Exs. 9-11 [Doc.

---

[8](...continued)
> letter stating that [Spiller] was having hallucinations and required 24 hour supervision. . . . Approved [Spiller] for benefits. I am reassessing at this time. [Spiller] and family are aware.

Defs.' Ex. 10 [Doc. No. 86-3].

Nos. 112-10 to -12].  Mottern noted the following in her "NotePad Report" on

August 22, 2008:

> Insured no longer meets cog. triggers -- in fact did very
> well on testing.  Needs assist[ance] with Bathing,
> Dressing for sleeves but lives in tropical climate on island
> of Maui [sic] Discovered caregiver is sig. other -- who
> resides with insured.  Falls under exclusion of "if no
> charge would be made in the absence of insurance. . ."
> Will approve thru September 6, 2008 due to lack of
> tim[e]liness on our part.

*Id.* Ex. 10 [Doc. No. 112-11].  Benefits were terminated as of September 1, 2008

(an August 25, 2008 entry reads "Error in above notepad dated 8/22/2008:

Approval to 8/31/2008, denied assessment #4."  *Id.*).  A September 19, 2008

Hartford letter confirmed the termination.  *Id.* Ex. 17.

Defendants dispute whether the July 28, 2008 BDA rendered Spiller

eligible.  They argue that Spiller needed help with only one ADL (bathing).  It was

reasonable, they contend, to presume that Spiller did not meet the ADL for dressing

because the July 28, 2008 BDA was inconsistent in describing how frequently she

needed such help (it stated "daily," "when needed," and "at times").  Defs.' Bad

Faith Mot. Ex. 16, at A000086, A000095 [Doc. No. 87-3].  In particular, they point

to comments from Kahalekulu stating "help needed [dressing] with sleeves on

tops," *id*. at A000086, and that Spiller "at times has difficulty putting on pull-over

tops and needs assistance from [Kahae]."  *Id.* at A000095.  (As quoted earlier,

Mottern noted her impression that Spiller "[n]eeds assist[ance] with . . . [d]ressing for sleeves but lives in tropical climate on island of Maui (sic).")  Pls.' Opp'n to Bad Faith Mot. Ex. 10 [Doc. No. 112-11].

And, although the BDA also stated that Spiller needed help dressing because of "confusion," Defendants look to the Folstein test score exceeding the eligibility threshold.  *Id.* Ex. 5 (Mottern Dep.), at 201-203 [Doc. No. 85-7]. Additionally, Defendants emphasize they had been waiting, after several requests, for medical records from Spiller's treating physician (Dr. McGuire) and argue that no other records indicated the frequency or severity of Spiller's seizures.  Cheryl Bush Decl., Oct. 7, 2010, ¶¶ 12, 14 [Doc. No. 85-1].[9]  They also point out that

---

[9]  On August 26, 2008, the day after the telephone call to Spiller terminating benefits, Dr. McGuire called Mottern and "wanted to know if there was anything he could do to change our minds."  Pls.' Opp'n to Bad Faith Mot. Ex. 14 [Doc. No. 112-15].  Mottern was apparently not impressed with Dr. McGuire (who had previously been described in LaFica's notes as a "surfing doctor"), as Mottern noted:

> I asked him what kind of Dr. he was, a general practitioner? . . . He said yes, a general practitioner.  I then asked, "a PCP?" [primary care physician]  He said yes, a "PCP[.]"  Throughout the conversation he spoke very slowly, in short sentences, often repeating what I said as a question.

*Id.*  Mottern further noted:

> I told him if he wanted to send us copies of his medical documentation concerning Penelope, we would be happy to review and consider the information.  'Send . . . the . . .documentation......' was his answer.  I [reiterated] we would like to review her records for the last two years,  . . . was it lots of pages?  He stated '. . . . .

(continued...)

Kahalekulu was a "third party vendor" and that they were entitled to have their own assessment done to confirm eligibility.

Mottern appears to have taken issue with benefits being paid to Kahae, Spiller's live-in companion. She noted that Kahae "falls under exclusion of 'if no charge would be made in the absence of insurance.'" Pls.' Opp'n to Bad Faith Mot. Ex. 10 [Doc. No. 112-11]. She was referring to an exclusion in the Policy for "any expenses incurred . . . for which no charge is normally made in the absence of insurance." *Id.* Ex. 3, at 19 [Doc. No. 112-4]. Defendants, however, had earlier approved Spiller's benefits for a private caregiver (*i.e.*, Kahae) under an "Alternative Care Benefit" provision -- which allowed benefits "for providers, treatments, or services not otherwise specified in the Policy" if "cost effective" "appropriate" and "consistent with general standards of care." *Id.* at 22.[10] That is,

_____

[9](...continued)
        lots . . . . of . . . . pages . . . . .' His voice drifted off."

*Id.*
        On October 3, 2008, Spiller's daughter, Jesse, called Mottern and was told that Dr. McGuire's records had not been received. *Id.* Ex. 18 [Doc. No. 112-19]. MedAmerica eventually received copies of Dr. McGuire's medical records on October 28, 2008 (some copies were apparently mailed to MedAmerica by Kahae or Spiller). Bush Decl. ¶ 14 [Doc. No. 85-1]. Defendants argue that Dr. McGuire's records still did not indicate the frequency or severity of Spiller's seizures, that she needed help with ADLs, or that she was cognitively impaired. *Id.*

  [10]  The original October 17, 2007 approval letter stated "As we have discussed, you intend to hire a caregiver privately. Your policy does not directly discuss reimbursement for privately hired caregivers. Reimbursement for this type of service is provided for under the Alternative Care Benefits[.]" Pls.' Opp'n to Bad Faith Mot. Ex. 5, at A000048 [Doc. No. 112-

Defendants apparently knew of, and approved, Spiller's situation with Kahae.

Defendants have not asserted the exclusion here as a basis for the termination, although Mottern raised it with Spiller when terminating her benefits. *Id.* Ex. 11 [Doc. No.112-12] ("We also discussed that policy has an exclusion about reimbursing if without this policy they would not charge. Her significant other is providing the care at this time."). And there is some indication that Spiller believed the exclusion was a basis for a denial of benefits. *See id.* Ex. 16 [Doc. No. 112-17] (Spiller email stating in part "They . . . Med America says that my evaluation said that I am better and that Markin [Kahae] should work for free"); Ex. 19 [Doc. No. 112-20] (Mottern's file note documenting conversation with Joe Sedita, an attorney friend of Spiller, stating "insured told him we won't let him use her boyfriend to care for her . . . . Did state that is not the issue at this time.").

In September 2008, Spiller again spoke with Mottern regarding the termination. Mottern wanted to schedule another BDA, and Spiller asked Mottern to contact Kahalekulu to conduct it. Mottern, however, questioned whether Kahalekulu was biased because he had become a friend of Spiller. *Id.* Ex. 15 [Doc. No. 112-16]; Ex. 16 [Doc. No. 112-17] (note from Spiller stating "[s]ince I said

---

[10](...continued)
6].

that [Kahalekulu] became my friend, they say he is not qualified to evaluate me and Med America will [choose] another nurse to send").

On September 19, 2008, Mottern confirmed in writing that Spiller's benefits had been denied based upon the July 28, 2008 BDA, but that Spiller's request to appeal (made during the earlier September 2008 telephone call) was accepted -- the letter stated "we have consented to your request for appeal via our phone conversation . . . .  Another assessment has been ordered."  *Id.* Ex. 17.

### 4.    *Post-cancellation Events*

After cancellation, Spiller focused her efforts on reinstatement and her appeal.  The record reflects numerous exchanges (telephonic, written, and email) between Spiller and Mottern, wherein Spiller repeatedly sought reinstatement of benefits.  The relationship between Mottern and Spiller appears to have become increasingly hostile.  For example, the record contains the following:

> • Spiller Deposition:  "I yelled at [Mottern], and I seized . . . .
> And [Mottern] insisted that I had done everything wrong.  I
> hadn't gotten her paperwork . . . .  While I was talking to her I
> would get upset.  She had a very like accusatory tone, you were
> friends . . . with Mike. . . .  She was awful."  *Id.* Ex. 12, Spiller
> dep., April 29, 2010, at 17-19 [Doc. No. 112-13];

> • Mottern:  "Insured called me again to re-iterate our
> conversations from yesterday.  She has sent us a picture of
> herself in her casket. . . .  Stated Martin [Kahae] has a separate
> address:  he is staying with her since she is sick.  I stated that is
> not what you told me yesterday."  Pls.' Opp'n to Bad Faith Mot.

15

Ex. 15 (Mottern notes of Sept. 3, 2008) ([Doc. No. 112-16]);

• Mottern: "I called insured to request that she stop
trying to reach out to [LaFica]. . . . She states [LaFica]
has been nice to her and I have been nothing but trouble
to her. . . . States she will seize and fall and hurt herself."
*Id.* Ex. 18 (Mottern notes of Sept. 19, 2008).

• Mottern: "Called today -- stated yesterday that she was left
alone and had a grand mal seizure -- 'if it wasn't for someone
coming in to give her valium . . . she would have died and I
would be happy' . . . . Continued to yell at me[.]" *Id.* Ex. 20
(Mottern notes of Oct. 22, 2008).

• Mottern: "When I asked her how she was doing sh[e] stated
'not well: still in seizure from yesterday' . . . . records from Dr.
McQuire (sic) are on the backs of MRI reports and [Spiller's]
funeral plot letter." *Id.* Ex. 23 (Mottern notes of Nov. 4, 2008).

• Mottern: "Penny stated that she wants Annette LaFica
back, as she understands her -- all her problems started
when I took over. . . . [She] [b]egan to get very excited
stating her policy is not medical necessity and she is tired
of all this. I stated she is right policy is not medical
necessity -- she started yelling she would like to strangle
me and became noticabley (sic) upset. I told her we
needed to hang up now." *Id.* Ex. 43 (Mottern notes of
Jan. 5, 2009).

Spiller testified by deposition that, after she and Kahae provided Dr.

McGuire's records to Defendants, Mottern told her "no, you touched it, no, the

evaluation we did was all wrong because you mentioned you'd become friends

with the nurse." *Id.* Ex. 12, at 17 [Doc. No. 112-13]. "[O]n my birthday she

informed me that she was pulling, basically pulling the plug on any reasonable cash

flow I had to keep me and my household operational and get the supervision I needed without having to call my children back to watch me all the time." *Id.* at 19. "I was very upset and I was very anxious. My seizures were increasing. I was worrying about my children." *Id.* at 24-25. It felt "like a death sentence." *Id.* Ex. 13.

After the termination, Spiller attempted suicide: "I took a hundred and six pills, a combination of Keppra and Diazepam, and a piece of banana. . . . I though I wouldn't be a burden to anybody[.]" *Id.* Ex. 12, at 22. She described what happened next: "I laid down . . . and [vomited] . . . and low and behold I wasn't dead. . . . I decided to fight." *Id.*

After her suicide attempt, Spiller was treated by psychiatrist Sonia Patel ("Dr. Patel"). *Id.* at 25. Dr. Patel wrote a letter to Mottern on October 29, 2008, stating, in part:

> I am currently providing Penelope with psychiatric treatment. She has suffered from emotional disturbances, including decreased mood and increased anxiety, since her Long Term Care Policy was stopped. . . . It is of utmost importance that Penelope be given continued care for brain cancer and brain cancer treatment sequelae, which include uncontrolled seizures, loss of balance and falls, disorientation, difficulties with memory, concentration, and spatial judgment. She requires no less than full time care in order to prevent injuries or possible death related to her unpredictable seizures or falls.

*Id.* Ex. 21 [Doc. No. 112-22]. Meanwhile, on November 10, 2008 Dr. McGuire

also wrote to Mottern, stating in part as follows:

> Ms. Spiller has been diagnosed with brain cancer and
> metastatic lung disease. Due to her diagnoses, Ms.
> Spiller also suffers from headache, blurred vision, vertigo
> tinnitus, speech and memory [loss], walking difficulty,
> weakness and seizure disorder. . . . [I]t is not medically
> recommended that patient be left unsupervised at any
> time of the day or night due to possible injuries or death.
> . . . .
> I've noted due to the matter of possible termination of her
> long term care has contributed to an increase of
> emotional symptoms and increase of seizure disorder
> within the past few months.

*Id.* Ex. 26 [Doc. No. 113-1]. Dr. McGuire followed with a similar letter on

November 17, 2008. *Id.* Ex. 28.

Mottern denied Spiller's appeal. By letter dated November 21, 2008,

Mottern wrote (again on Hartford stationary) that "[t]he denial of benefits under

your Hartford long term care policy documented in our letter to you on September

19, 2008, has been upheld. Please know that we have carefully reviewed all

documentation presented to us, to render this decision." *Id.* Ex. 30. This letter

followed up on a November 4, 2008 decision to deny the appeal, and notification

by telephone after Spiller's daughter called Mottern. *Id.* Exs. 10, 23. Mottern's

notes state her reasoning:

> Nothing documents her inability to perform her activities

> of daily living.  Have records from Dr. Thompson --
> which are the most credible; record from Dr. McQuire
> (sic) are on the backs of MRI reports and Penny's funeral
> plot letter.  Letter from psychiatrist stating she needs
> benefits.  None of it is credible except the records from
> Dr. Thompson.

*Id.* Ex. 23.  Mottern had also documented the denial in a "notepad" report on

November 4, 2008:

> BDA received was not conclusive as narrative did not
> match objective info.  Unable to get another assessor to
> go out to see her as assessor felt threatened by comment
> from insured about her being part of denial and question
> if ever saw the movie Psycho.
>
> Info received from PCP is for year 2007 only.  Have
> requested documents from him 3 times.  Neuro
> Radiologist Dr. Thompson gives the most clear cut,
> objective assessment. . . .  Letter from Psychiatrist was
> requested by insured.  Therefore, I have to believe the
> best evidence we have obtained is from Dr. Thompson.

*Id.* Ex. 10.  Dr. Thompson's records indicated that Spiller had experienced only

one grand mal seizure in the last year and half, her mental status was normal, she

had no "focal deficits," and that as of June 2008 Spiller was doing well.  *Id.* Exs.

10, 23.

Spiller then filed complaints with the New York Insurance

Department and the Hawaii Department of Commerce and Consumer Affairs,

Insurance Division.  *Id.* Exs. 24-25 [Doc. Nos. 112-25 & -26].  On December 5,

2008, MedAmerica responded to an inquiry from the Hawaii Insurance Division, explaining its position that Spiller did not meet the policy triggers based upon her July 28, 2010 BDA and medical records received. *Id.* Ex. 40 [Doc. No. 113-15]. The Hawaii Insurance Division responded on December 17, 2008, noting that the letters from two of Spiller's physicians indicated that Spiller appeared to fulfill the Policy requirements, and that MedAmerica needed to obtain a BDA justifying its decision to deny benefits. *Id.* Ex. 41 [Doc. No. 113-16].

On January 5, 2009, Spiller's counsel, Mark Davis, wrote a letter to Mottern demanding reinstatement of Spiller's full policy benefits, reimbursement for the costs she had incurred since August 2008, and threatening a bad faith suit. *Id.* Ex. 44. On that same day, Spiller also contacted Mottern to report that she had a seizure over the weekend and had been taken to Molokai Hospital. *Id.* Ex. 43.

On January 9, 2009, a fourth BDA was performed. It indicated that Spiller was chronically ill, requiring assistance with all ADLs, and was a threat to her own safety. *Id.* Exs. 46, 49, 50. On January 23, 2009, Defendants restored Spiller's benefits, and notified her that "in good faith the approval period begins on 9/1/08," *i.e.*, retroactively. *Id.* Ex. 47. Hartford Life's representative testified that the BDA indicated that "[Spiller] had clearly gotten worse" and benefits were reinstated retroactively because "with that [January 2009] assessment . . . we had

no other date to go back to other than the original date [September 1, 2008]."

Defs.' Bad Faith Mot. Ex. 3, Bush dep. at 193 [Doc. No. 85-5].

Finally, the Complaint alleges that on June 1, 2009 Hartford Life attempted to have Spiller sign an authorization for Alternative Care Benefits, which would release Hartford Life from any claims, including for bad faith, and "threatened [Spiller] that her claim payments would not be approved unless she signed and returned the document to Hartford." Compl. ¶ 37; Mot. to Withdraw Ex. 17 [Doc. No. 124-19].

## B.    Procedural Background

### 1.    The Complaint

Spiller filed this action on July 9, 2009 in the Circuit Court for the Second Circuit, State of Hawaii, alleging the following claims against all Defendants: (1) bad faith, (2) negligent infliction of emotional distress ("NIED"), (3) intentional infliction of emotional distress ("IIED"), and (4) punitive damages. Defendants removed the action to this court on August 18, 2009, based upon diversity of citizenship.

The first count alleges that Defendants "unreasonably and wrongfully denied and delayed payment of long term care benefits" and thereby breached a "fundamental duty to treat Penny Spiller fairly and in good faith . . . in the

investigation and handling of Penny Spiller's insurance claim."  Compl. ¶ 42.  It

concluded that "[a]s a direct and proximate result of the Hartford Defendants'

unreasonable conduct in denying and delaying payment of long term care benefits,

Penny Spiller has suffered economic loss and severe emotional distress, entitling

Penny Spiller to recover special, general, and punitive damages[.]"  *Id.* ¶ 46.

### 2. *Request for Answers to Admissions*

One particular aspect of discovery becomes paramount here:  During

discovery, Defendants served Spiller with a First Request for Answers to

Admissions.  On September 27, 2010, Spiller's counsel answered "admit" to the

following Requests for Answers:  (1) "You are not making a claim for economic

loss" and (2) "You are not making a claim for physical injury."  Defs.' Bad Faith

Mot. Ex. 33, at 6 [Doc. No. 88-11].

### 3. *The Motions*

Hartford Life filed the Punitive Damages Motion [Doc. No. 81] on

October 7, 2010.  All Defendants filed the Bad Faith Motion [Doc. No. 84] on

October 8, 2010.  Spiller filed Oppositions to both Motions on November 15, 2010,

and Defendants filed Replies on November 22, 2010.  Those Motions were argued

on December 6, 2010.[11]  At the hearing, the court requested supplemental briefing addressing whether a claim for -- or recovery for, or evidence of -- economic loss or physical injury is necessary before an insured can recover emotional distress damages caused by insurer bad faith.

On December 14, 2010, Spiller filed the Motion to Withdraw [Doc. No. 124], seeking to withdraw her September 27, 2010 admissions that she was not making claims for economic loss or physical injury.  Defendants filed an Opposition to the Motion to Withdraw on January 3, 2011, and Spiller filed a Reply and Supplemental Reply on January 10, 2011.  Upon request by the court as to the appropriateness of certifying questions of law under Rule 13, the parties filed Supplemental Memoranda on February 18, 2011, and the court held a further hearing on February 25, 2011.

After considering all the briefing and the arguments of counsel, the court determines that certification is appropriate.  To follow, the court sets forth the primary issues raised in the Motions, makes certain preliminary rulings, and explains the reasons for certification.

---

[11] During that hearing, Spiller's counsel stated Spiller was no longer pursuing the separate claims for Negligent or Intentional Infliction of Emotional Distress.  Counsel reiterated in open court on February 25, 2011 that Spiller was dropping the emotional distress claims.

# III. DISCUSSION

## A.    The Bad Faith Motion

### 1.    *Evidence Supports a Bad Faith Claim*

In their Motion for Summary Judgment, Defendants first argue that there is no genuine dispute of material fact that MedAmerica (acting primarily through Mottern) acted reasonably and in good faith in terminating Spiller's benefits on August 25, 2008 (and in denying the subsequent internal appeal of that termination).  Even if Mottern was mistaken, they argue, there undisputedly was no bad faith.  Even assuming Mottern wrongly concluded that Spiller did not qualify as "chronically ill" and wrongly terminated benefits, Defendants argue it was nevertheless reasonable for Mottern to believe that the July 28, 2008 BDA contained inconclusive and conflicting information such that Spiller no longer met minimum eligibility requirements (inability to perform more than one ADL) under the Policy.  *See*, *e.g.*, *Best Place, Inc. v. Penn Am. Ins. Co.*, 82 Haw. 120, 133, 920 P.2d 334, 347 (1996) (providing that "conduct based upon an interpretation of the insurance contract that is reasonable does not constitute bad faith . . . .  In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages") (citations omitted).  Defendants also contend that Spiller was never truly deprived of services as she

continued to receive care from Kahae, albeit without compensation, during the time Defendants failed to pay benefits.

Construing the facts in the light most favorable to Spiller, the record contains ample evidence that a factfinder could reasonably interpret as constituting bad faith. In short, there is a genuine issue of material fact as to whether Defendants acted in bad faith.

A reasonable jury could find that an insurer acts in bad faith by canceling long-term care benefits for a sixty-three year old woman dying from incurable lung and brain cancer -- where the cancellation is based on inconsistent phrasing in a BDA ("at times," "daily") as to the need for help with dressing, and a belief that a woman living in a tropical climate on a Hawaiian Island would have no need to wear clothes with sleeves (and thus did not need assistance with dressing) -- after previously finding her eligible for benefits for nearly a year based upon two prior qualifying BDAs. A fact-finder could take into account -- again construing the evidence in Spiller's favor -- that Defendants cancelled and failed to reinstate benefits (without proper investigation into Spiller's situation on an island like Molokai) simply because Mottern mistrusted Spiller where: (1) her care-giver was also her live-in companion (even though Defendants previously approved such care), (2) she befriended the BDA nurse, and (3) her primary care physician (whom

notes indicated was "a surfing doctor") talked slowly. A fact-finder could take into account evidence indicating that Defendants unreasonably ignored information as "not credible" from the care-giver, the policy-holder, a family member, and two treating physicians located on Molokai (Drs. McGuire and Patel), in favor of a neurologist located on a different island (Dr. Thompson). In sum, there is ample evidence in the record such that a fact-finder could conclude that the denial of benefits was in bad faith. *See, e.g.*, *Best Place*, 82 Haw. at 132, 920 P.2d at 346 ("an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation of its denial") (quoting *Egan v. Mut. of Omaha Ins. Co.*, 620 P.2d 141, 146 (Cal. 1979)).

## 2. *Necessity of a Separate Claim for "Substantial Economic (or Financial) Loss" to Recover for Emotional Distress*

Defendants argue that, regardless of whether they acted in bad faith, they are nevertheless entitled to summary judgment because Spiller cannot recover emotional distress damages (the only type of damages sought), where she is not making (or is no longer making) any claim for economic loss caused by that bad faith. This is a consequence of Spiller's September 27, 2010 admission that she is "not making a claim for economic loss."[12] Defendants rely primarily on California

---

[12] Spiller also admitted she is "not making a claim for physical injury," but it is unclear whether a lack of "physical injury" makes any difference in this context regarding emotional

(continued...)

law indicating that substantial economic or financial loss is required before an insured may recover emotional distress damages for bad faith. *See, e.g., Pershing Park Villas Homeowners Ass'n, v. United Pac. Ins. Co.*, 219 F.3d 895, 904 (9th Cir. 2000) ("[A] plaintiff may recover damages for all emotional distress incident to an insurer's bad faith denial of coverage, *so long as the insurer's conduct also resulted in substantial financial loss.*") (emphasis added); *see also Waters v. United Servs. Auto. Ass'n*, 48 Cal. Rptr. 2d 910, 916 (Cal. App. 1996) ("Under *Gruenberg [v. Aetna Ins. Co.*, 510 P.2d 1031 (Cal. 1973)] . . . emotional distress damages are recoverable in a first party bad faith case only when the insured establishes financial loss . . . . Then, and only then, may the insured recover for emotional distress damages as well as the pecuniary loss."); *Maxwell v. Fire Ins. Exchange*, 70 Cal. Rptr. 2d 866, 869 (Cal. App. 1998) (following *Waters*).

---

[12](...continued)
distress damages for bad faith. The case law discussed *infra* relies on "substantial economic" or "financial" loss as a threshold for emotional distress bad faith damages -- with no mention of "physical injury." (Physical injury might have some applicability to a separate claim for emotional distress, *i.e.*, NIED or IIED -- but Spiller has indicated she is not pursuing an NIED or IIED claim.) Nor is it clear whether accompanying "physical injury" could substitute for the "substantial economic loss" necessary to seek recovery for emotional distress for insurer bad faith -- if "physical injury" caused by bad faith were distinguishable from the emotional distress itself. *Cf., e.g., Garvis v. Employers Mut. Cas. Co.*, 497 N.W.2d 254, 257 (Minn. 1993) ("emotional distress with appreciable physical manifestations can qualify as a 'bodily injury' within the meaning of the insurance policy"); *Aim Ins. Co. v. Culcasi*, 280 Cal. Rptr. 766, 772, 776 (Cal. App. 1991) (indicating that physical manifestations accompanying emotional distress are "bodily injuries" as that term is used in insurance policies). These are issues of state law best left to the Hawaii Supreme Court.

Under California law, the threshold showing of substantial economic or financial loss is necessary because of the nature of a bad faith cause of action. "[Bad faith] is actionable because such conduct causes financial loss to the insured, and *it is the financial loss or risk of financial loss* which defines the cause of action. Mental distress is compensable as *an aggravation of the financial damages, not as a separate cause of action.*" *Major v. W. Home Ins. Co.*, 87 Cal. Rptr. 3d 556, 572 (Cal. App. 2009) (quoting *Gourley v. State Farm Mut. Auto. Ins. Co.*, 822 P.2d 374, 379 (Cal. 1991)). A bad faith action "is an action for the interference with property rights, not personal injury." *Gourley*, 822 P.2d at 378 (citing *Gruenberg*, 510 P.2d at 1041). The requirement is meant also "to reduce the risk of fictitious claims and those based simply on bad manners[.]" *Waters*, 48 Cal. Rptr. 2d at 921. *See Molien v. Kaiser Found. Hosp.*, 616 P.2d 813, 818-19 (Cal. 1980) (recognizing that "substantial damages apart from those due to mental distress" discussed in cases such as *Crisci v. Security Ins. Co.*, 426 P.2d 173 (Cal. 1967), and *Gruenberg* exemplify a "guarantee of genuineness" of emotional distress).

In response, Spiller points to the precise phrasing of the admission: She has admitted that she is not making a "claim" for economic loss -- not that she did not *sustain* such a loss. She contends she sustained economic losses such as

fees or costs incurred in fighting to reinstate her benefits as part of the internal

appeal after the August 25, 2008 cancellation (*e.g.*, costs attendant to obtaining

assistance from the Hawaii and New York Insurance Divisions, and costs or fees of

retained counsel who investigated the matter and wrote letters to Defendants).  She

also points to alleged costs associated with her attempted suicide, and subsequent

treatment by a psychiatrist.[13]

She also argues that, even if a substantial economic loss rule applies,

such loss is necessarily established where an insurer, in a first-party benefits

context, denies "primary benefits" (such as Spiller's long-term care benefits that

were terminated for five months), which are the "precise benefit[s] the [insurance]

contract was designed to secure."  *Love v. Fire Ins. Exch.*, 271 Cal. Rptr. 246, 252,

256 (Cal. App. 1990).  *But see Major*, 87 Cal. Rptr. 3d at 571 ("The delayed

payment of benefits, standing alone, without resulting economic damages, is

insufficient to support an award of emotional distress damages [for bad faith]");

*Maxwell*, 70 Cal. Rptr. 2d at 868  ("a delay in paying policy benefits, even if in an

unreasonable manner, does not in itself establish economic loss to the plaintiff").

---

[13] The current record does not contain evidence substantiating any dollar amounts for such economic losses.

**B.    The Motion to Withdraw**

Faced with the prospect of the court granting Defendants' Bad Faith Motion based upon her apparent tactical decision to waive a claim for economic or physical loss, Spiller filed the Motion to Withdraw after the Bad Faith Motion was argued.  She seeks to withdraw her admissions that she is not "making a claim" for economic loss or physical injury.  Doing so, Spiller argues, would properly allow her to seek damages for emotional distress because the record contains evidence of "substantial economic loss" (*e.g.*, attorneys' fees and costs incurred in obtaining a reinstatement of benefits) or perhaps alleged expenses related to subsequent "physical injury" (her suicide attempt and psychiatric treatment).  Her counsel attests that the admissions were made to center the trial on her essential damages -- "extraordinary and dramatic emotional distress" for the period in which her benefits were denied.  *See* Davis Decl., Dec. 14, 2010, ¶ 9 [Doc. No. 124-2].  "The purpose of these admissions was to narrow and focus the case for trial, considerations that were the subject of discussions between counsel for [Spiller] and Defendants."  Pls.' Mot. to Withdraw, at 13 [Doc. No. 124-1].  According to counsel, by withdrawing the admissions, Spiller would seek such threshold damages (even if she would rather not) if only to pursue her claim for emotional distress damages should the court apply the economic loss requirement.

Withdrawal of an admission is permitted under Rule 36 of the Federal

Rules of Civil Procedure, which provides in part as follows:

> Subject to Rule 16(e), the court may permit withdrawal
> or amendment if it would promote the presentation of the
> merits of the action and if the court is not persuaded that
> it would prejudice the requesting party in maintaining or
> defending the action on the merits.

Fed. R. Civ. P. 36(b).

Hadley v. United States, 45 F.3d 1345 (9th Cir. 1995), analyzed the

two requirements for withdrawal of an admission under Rule 36(b):  "(1)

presentation of the merits of the action must be subserved, and (2) the party who

obtained the admission must not be prejudiced by the withdrawal." *Id.* at 1348.

The first part of the test is met when the admissions would "practically eliminate

any presentation of the merits of the case." *Id.*  The second part focuses on

prejudice:

> The prejudice contemplated by Rule 36(b) is "not simply
> that the party who obtained the admission will now have
> to convince the factfinder of its truth.  Rather, it relates to
> the difficulty a party may face in proving its case, *e.g.*,
> caused by the unavailability of key witnesses, because of
> the sudden need to obtain evidence" with respect to the
> questions previously deemed admitted.

*Id.* (quoting *Brook Village N. Assocs. v. Gen. Elec. Co.*, 686 F.2d 66, 70

(1st Cir. 1982)).

Spiller argues that allowing her to withdraw the admissions would promote presentation of the merits of the emotional distress claim. She does not (or did not) want to pursue such damages to a jury but would do so if the law requires her to do so as a prerequisite to pursuing emotional distress damages.

In opposing withdrawal, Defendants point out that discovery deadlines have passed and Spiller neither disclosed a calculation of economic damages nor provided specific evidence of financial loss, even when asked to identify all categories of damages "sustained" and all documents used to calculate damages. *See* Defs.' Opp'n to Mot. to Withdraw, Ex. B [Doc. No. 135-3]. They also assert substantial prejudice -- Spiller has now died and, although she was deposed prior to her passing, Defendants will now have no opportunity to cross-examine her on issues of economic loss and additional physical injury.

In deciding the Motion to Withdraw, then, the court must also consider the procedural posture under which the Motion arose. The court must consider it in conjunction with the issues presented in the Bad Faith Motion to determine whether withdrawal will "subserve" presentation of the merits and whether it will prejudice Defendants.

C.    **The Punitive Damages Motion**

In its Punitive Damages Motion, Hartford Life seeks summary

judgment on Spiller's punitive damages claim, arguing as matters of fact and law that Spiller cannot recover such damages against Hartford Life. The Motion is based primarily on the Reinsurance Agreement whereby Hartford Life transferred its long-term care policies to MedAmerica. The extent of that transfer is at issue in the Motion.

Hartford Life contends it cannot be liable for punitive damages because (1) factually, it was not involved at all in any of the decisions regarding the cancellation or reinstatement of Spiller's benefits, and (2) legally, it cannot be vicariously liable under Hawaii law for decisions made by MedAmerica, even if MedAmerica was its managing agent for non-consenting policyholders such as Spiller.

It is undisputed that Hartford Life itself was not involved in the granting, termination, or reinstatement of Spiller's long-term care benefits. No Hartford Life employee made any decisions regarding Spiller's benefits. Whether Hartford Life *should* have been involved, and whether it can potentially be vicariously liable for any punitive damages is a different question. The answer depends on an interpretation of certain terms of the Reinsurance Agreement, and on whether Hawaii law permits a principal to be liable for punitive damages based upon acts of a managing agent.

The main question is whether Hartford Life can be vicariously liable as a matter of Hawaii law for punitive damages for acts of MedAmerica performed as Hartford Life's managing agent. In this regard, Defendants rely on case law such as *Jenkins v. Whittaker Corp.*, 551 F. Supp. 110, 112 (D. Haw. 1982), indicating that a managing agent cannot render a principal liable for punitive damages, absent specific authorization or ratification by the principal. *See also*, *e.g.*, *In re WPMK Corp.*, 59 B.R. 991, 995-96 (D. Haw. 1986).

Spiller, however, relies on a "modern" theory set forth in the Restatement (Second) of Agency § 217C(c) and Restatement (Second) of Torts § 909(c), under which punitive damages may be awarded against a principal if "the agent was employed in a managerial capacity and was acting in the scope of employment." Spiller also contends that, in any event, Hartford Life ratified the acts of MedAmerica or is otherwise estopped from disclaiming such potential liability.

Ultimately, however, the court need not reach questions regarding punitive damages if Spiller cannot recover under her bad faith claim in the first place -- she would not qualify to recover punitive damages. And that issue is the subject of the Bad Faith Motion.

**D.      Certification of Questions Under Rule 13 is Appropriate**

Upon close examination of the facts and law raised by the Motions, and given the procedural posture of this case, the court concludes that resolution of all three Motions ultimately turn on a question of Hawaii law ("the First Question"), stated as follows:

> If an insurer commits bad faith, must an insured prove
> she suffered substantial economic or physical loss caused
> by the bad faith to recover emotional distress damages
> caused by the bad faith?

The answer to the First Question is "determinative of the cause" for all three Motions for purposes of certification of this question of Hawaii law under Rule 13.

### 1.      *"Determinative of the Cause" for the Bad Faith Motion*

It appears well-accepted (at least under California law) that substantial economic loss is required before an insured may recover any emotional distress damages caused by insurer bad faith.  *See*, *e.g.*, *Pershing Park Villas Homeowners Ass'n*, 219 F.3d at 904; *Waters*, 48 Cal. Rptr. 2d at 916; *Major*, 87 Cal. Rptr. 3d at 572.  If the answer to the First Question is yes under Hawaii law, Spiller may be barred from obtaining emotional distress damages and -- possibly depending on answers to related questions of Hawaii law -- Defendants may be entitled to a grant of summary judgment on the Bad Faith Motion.

As analyzed above, the court does find there is a genuine issue of

material fact as to whether the denial of (or cancellation of) benefits to Spiller was

in bad faith -- thus, the dispositive issue is whether Spiller may obtain damages for

emotional distress for that bad faith.  Resolving the Bad Faith Motion depends

upon whether Hawaii law requires "substantial economic loss"[14] as a prerequisite

to obtaining damages for emotional distress.

      Hawaii bad faith law generally derives from California bad faith law.

*See Best Place*, 82 Haw. at 133, 920 P.2d at 347 ("We believe that the appropriate

test to determine bad faith is the general standard set forth in *Gruenberg* and its

progeny.").  And this court often looks to California authority in insurance-related

matters.  *See, e.g.*, *Allstate Ins. Co. v. Kim*, 121 F. Supp. 2d 1301, 1307 n.3 (D.

Haw. 2000) (collecting cases).  Further, other jurisdictions agree with California in

this regard.  *See, e.g.*, *Farmers Ins. Exchange v. Shirley*, 958 P.2d 1040, 1046-47

(Wyo. 1998); *Farr v. Transamerica Occidental Life Ins. Co.*, 699 P.2d 376, 382

(Ariz. App. 1984).

      But other jurisdictions do not require substantial economic loss as a

threshold before allowing recovery for emotional distress for insurer bad faith.  *See*

---

[14] California courts have used the terms "*substantial* economic loss" or "substantial *financial* loss."  Hawaii law might use a different term (*e.g.*, "meaningful" or "material" or "actual") or might simply require some non-de minimis economic or financial loss so as to alleviate concerns about "fictitious" claims for emotional distress.  *See Waters v. United Servs. Auto. Ass'n*, 48 Cal. Rptr. 2d 910, 916 (Cal. App. 1996).  For consistency, the court here will use the phrase "substantial economic loss" to encompass these types of losses.

*Goodson v. Am. Standard Ins. Co. of Wisc.*, 89 P.3d 409, 414 (Colo. 2004) (en banc).  Hawaii courts have not directly addressed this question.  The general statement in *Best Place*, 82 Haw. at 133, 920 P.2d at 347 ("[a]n unreasonable delay in payment of benefits will warrant recovery for compensatory damages"), cited by Spiller, does not answer whether there might be prerequisites for such "compensatory damages."  And, although Defendants cite Hawaii law -- *Guajardo v. AIG Haw. Ins. Co.*, 118 Haw. 196, 207, 187 P.3d 580, 591 (2008) -- hinting at a "substantial economic loss" requirement, there is also Hawaii case law holding that "substantial loss" may be satisfied with relatively small amounts (although in a fraud context).  *See Zanakis-Pico v. Cutter Dodge, Inc.*, 98 Haw. 309, 320-22, 47 P.3d 1222, 1233-35 (2002).  The First Question is an open question of Hawaii law.

2. ***"Determinative of the Cause" for the Motion to Withdraw***

The answer to the First Question is also determinative of the Motion to Withdraw.  Construing Spiller's answers to the request for admissions literally -- meaning Spiller is not making a *claim* for economic loss but not that Spiller did not *suffer* some economic loss or physical injury -- then the issue arises whether her answers bar a claim for emotional distress.  In other words, must a plaintiff seek and recover for substantial economic loss as a condition to securing emotional distress damages, or must a plaintiff simply prove that in fact she did suffer

substantial economic loss?

In the Motion to Withdraw, Spiller admits that she only seeks to withdraw her admissions if it is necessary as a matter of law for her to make a claim for (*i.e.*, obtain recovery for) substantial economic loss before seeking damages for emotional distress. Spiller only seeks to withdraw the admissions if she must.

As set forth earlier, a court may permit withdrawal of an admission "if it would promote the presentation of the merits of the action" and "if the court is not persuaded that it would prejudice the requesting party in . . . defending the action on the merits." Fed. R. Civ. P. 36(b). The inquiry becomes circular. In the present posture, it is not possible to determine whether allowing withdrawal will "promote presentation of the merits" or "prejudice the requesting party" without knowing whether Hawaii law requires a plaintiff to make a claim (and, if so, to obtain recovery) for substantial economic loss before obtaining emotional distress damages for bad faith.

If Hawaii law does not require a claim for substantial economic loss, then Spiller's admissions mean little; the Motion to Withdraw would be moot. But if Hawaii does require an actual claim, then allowing withdrawal may indeed promote "presentation of the merits" of whether Spiller may be entitled to damages

for emotional distress.  Accordingly, the answer to the First Question is "determinative of the cause" as to the Motion to Withdraw.

### 3. *"Determinative of the Cause" for the Punitive Damages Motion*

The answer to the First Question may thus also be determinative of the Punitive Damages Motion.  Although the primary issue in the Punitive Damages Motion -- whether Hartford Life can be vicariously liable in punitive damages for any misconduct of its managing agent MedAmerica -- is not related to whether substantial economic loss is a prerequisite to recovery of emotional distress damages for bad faith, the First Question is a threshold matter for the Punitive Damages Motion in the current posture.  If the Bad Faith Motion is granted, the court need not address the question whether Hartford Life can be vicariously liable for punitive damages.  The court would not need to interpret the complex provisions of the Reinsurance Agreement or reach whether to apply the rule stated in cases such as *Jenkins*, 551 F. Supp. at 112, and *In re WPMK Corp.*, 59 B.R. at 995-96.  The Punitive Damages Motion would be moot, and in that sense the answer to the First Question is "determinative of the cause" for this Motion.

### 4. *Additional Questions*

If the answer to the First Question is yes, it leads to related follow-on

questions of Hawaii law that are potentially "dispositive of the cause" under Rule 13, to wit:

> If an insured must suffer substantial economic or physical loss to qualify for emotional distress damages caused by insurer bad faith, what does Hawaii law require as to how that loss must be proven?

This question derives from practical questions regarding trial or pretrial proceedings. Must economic damages be proven to a factfinder as a separate claim in the plaintiff's action? Does the bad faith merely have to result in such loss? Or may such damages be proven outside of a separate claim, as a threshold showing as determined by the fact finder? *Compare Major*, 87 Cal. Rptr. 3d at 571 (concluding "that in determining whether the emotional distress damages award will withstand scrutiny, we may only consider the actual damages the jury awarded the Majors, including the attorney fees award, as those are the only items of economic loss actually suffered"). Or is it enough that the record merely contain some reliable evidence of such economic or physical loss as determined by the court? And there is a further question:

> If a plaintiff must prove substantial economic or physical loss, must any emotional distress damages bear a reasonable relationship to that loss?[15]

---

[15] *See, e.g.*, *Major v. W. Home Ins. Co.*, 87 Cal. Rptr. 3d 556, 572 (Cal. App. 2009) ("[T]he *amount* of emotional distress damages is . . . tied to the amount of economic damages"

(continued...)

These are open questions of Hawaii law, and answers (1) appear

necessary to resolve the pending Motions, (2) are important and open questions in

the area of insurance bad faith, and, (3) may determine whether or how the present

action proceeds.

## IV.  CONCLUSION AND RECITATION OF CERTIFIED QUESTIONS

Given the procedural posture of this action and the three Motions now

under submission, the court certifies the following questions to the Hawaiʻi

Supreme Court:

> If an insurer commits bad faith, must an insured prove
> she suffered substantial economic or physical loss caused
> by the bad faith to recover emotional distress damages
> caused by the bad faith?
>
> If an insured must suffer substantial economic or
> physical loss to qualify for emotional distress damages
> caused by insurer bad faith, what does Hawaii law
> require as to how that loss must be proven?
>
> If a plaintiff must prove substantial economic or physical
> loss, must any emotional distress damages bear a
> reasonable relationship to that loss?

The court's "phrasing of the question[s] should not restrict the

[Hawaiʻi Supreme Court's] consideration of the problems and issues involved.

---

[15](...continued)
and "[in] determining whether the noneconomic damages award is excessive, we compare the
amount of that award to the economic damages award, to see if there is a reasonable relationship
between the two.") (Emphasis in original).

41

The [Hawai'i Supreme Court] may reformulate the relevant state law questions as it perceives them to be, in light of the contentions of the parties." *Allstate Ins. Co. v. Alamo Rent-A-Car, Inc*., 137 F.3d 634, 637 (9th Cir. 1998) (citation and quotation signals omitted). If the Hawai'i Supreme Court declines to accept certification, this court will "resolve the issues according to [its] understanding of Hawaii law." *Id*. (citation and quotation signals omitted).

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 7, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Miller, et al. v. Hartford Life Ins. Co., et al.*, Certified Questions to the Hawai'i Supreme Court from the United States District Court for the District of Hawaii in Civ. No. 09-00381 JMS-RLP

42